**BELL et al. v. MULKEY.** (No. 1224—5243.)

Commission of Appeals of Texas, Section A. April 24, 1929.

and a "reasonable attorney's fee"; (b) payment of the note, though demanded, has been refused; (c) September 12, 1913, they "sold and delivered" (at "Chillicothe, Texas") to Mulkey "the following described Champion Silos * * * 1—14x30 Pine Silo of the value of $258.50, 1—14x30 Two-Piece Oregon Fir Silo of the value of $309.00," and the same were by Mulkey (at Chillicothe, Tex.) accepted on "said date"; (d) "said transaction" (i. e., what happened at Chillicothe on September 12, 1913) was evidenced by written contract bearing date September 12, 1913, pleaded in hæc verba (substantially reproduced on page 786 of 248 S. W.); (e) such "written contract" is pleaded in hæc verba "in aid and explanation" of other averments in the petition; (f) said "written contract," i. e., of September 12, 1913, was "accepted" by plaintiffs "and in pursuance thereof they delivered * * * the property" described. The prayer is alternatively for judgment as on the "promissory note" and on the "written contract" of September 12, 1913.

Mulkey in "answer," and also as basis for cross-action, charged: (a) That "on or about the 12th" of September, 1913, Bell and Clift "were owners of two certain silos, which they have theretofore shipped to some party or parties at Chillicothe, Texas, and which the parties to whom they had been shipped had refused to accept"; (b) plaintiffs, acting through their sales agent, etc., "solicited" him to "buy said two silos," whereupon he "contracted to buy them upon named terms"; (c) by that contract he was obligated to "haul said silos, or the materials for erecting said silos (same having been shipped in a knocked-down condition) * * * to his farm," to "have foundations built upon which said silos were to be erected," to "furnish the necessary labor to erect said silos"; (d) by that contract "plaintiffs' agent and representative" was to "supervise the work of erection of said silos" and to "see that they were properly erected and constructed"; (e) "when said silos were so erected and completed," according to the contract, he (Mulkey) "would execute his note for the sum of $475.-00 due November 1st, 1914, * * * * in full payment for said silos"; (f) he was induced to make such contract by representations of plaintiffs and their representatives of suitability of "said silos when * * * so erected by them" for the purposes in mind; (g) after such "contract" had been made, "plaintiffs' agent and representative requested" him (Mulkey) "to sign a written order addressed to plaintiffs" (i. e., the so-called "written contract" of date September 12, 1913) "merely as a matter of form so that the plaintiffs might have a record of the transaction," and he signed same (but this was but a "matter of form," not "intended

P. G. Dedmon and J. A. Templeton, both of Fort Worth, and Chas. Y. Welch, of Quanah, for plaintiffs in error.

Marshall & Perkins, of Quanah, for defendant in error.

### Statement of the Case.

NICKELS, J. Bell and Clift (doing business in name of "Western Silo Company") sued Mulkey alleging, in substance: (a) That Mulkey on October 9, 1913, "for value received, in keeping with his written contract theretofore made on September 12th, 1913," executed and delivered to them a promissory note for the principal sum of $475, payable November 1, 1914, and providing for interest

to be acted upon * * * and not acted upon" by plaintiffs, and wholly without consideration), and such "written order," in terms, referred to silo material to be shipped to Chillicothe and not to materials (actually bought) already at Chillicothe, no materials having been shipped to Chillicothe pursuant to the "written order"; (h) he (Mulkey) did his part and "plaintiffs' agent and representatives" supervised "the erection of said silos," and what his (Mulkey's) employees did was done under and in accordance with "instructions" of such supervisor; (i) the materials were defective, and on account of this and on account of the "manner in which they were erected by plaintiffs' said agent" said silos, as erected, were wholly worthless, and, in fact, "fell down or were blown down on the evening of the same day that the work of their erection was completed" (i. e., October 8, 1913); (j) he (Mulkey) was in the city of Quanah (several miles from location of the silos) on October 8th and 9th; (k) "plaintiffs' representative who supervised the work of * * * erection of said silos came into the town of Quanah," and "on the morning of the 9th day of October, 1913," he (Mulkey) "executed and delivered the note sued on * * *, in payment for said silos," but that he (Mulkey) did not then know that the silos had fallen down and become "absolutely worthless"; (l) "at the time of the execution and delivery of said note it was known that one of said silos was not plumb and that the lumber of which it was constructed did not go together properly and the plaintiffs' said agent and representative then agreed that plaintiffs would have a man to put said silo in good condition in case defendant" (Mulkey) "could not do so himself, * * * and a notation to this effect was written upon the back of said note at the time it was executed and was made a part of said note"; (m) consideration of the note and contract therefore failed.

Mulkey prayed for cancellation of the note and for judgment for amount of expenses incurred in undertaking to comply with the contract and for damages incurred by reason of loss of ensilage facilities on account of defectiveness and worthlessness of the two "silos," and for general relief.

By supplemental petition Bell and Clift denied the allegations of Mulkey's answer, and averred. in substance: (a) The "written contract" (called "order") of date September 12, 1913, was "accepted" by them and "became and was the original contract in writing between plaintiffs and defendant upon which and under and in pursuance of the terms whereof the property described * * * in said contract" (and in their petition) "was delivered and accepted by defendant at Chillicothe * * * on * * * the 12th day of September, 1913"; (b) "soon after said order was given by defendant the same was transmitted to * * * plaintiffs at their home office in the city of Des Moines, Iowa, and the same was then and there duly accepted by plaintiffs as the contract between them and said defendants"; (c) prior to such "acceptance" the "silos" described in said order had been delivered to and accepted by said defendant at Chillicothe, Texas"; (d) they did not "at any time or in any way contract or agree with defendant to erect said silos on his premises, but same were delivered to and accepted by him in a knocked-down condition at Chillicothe"; (e) defendant having received said silos in a knocked-down condition as aforesaid "transported same to his farm and caused them to be erected thereon and soon after same were erected by him he * * * executed and delivered to * * * Schopmeyer, who made said settlement with said defendant, the note * * * sued on," defendant then insisting upon and causing an indorsement (i. e., "owing to damp weather while erecting pine silo 14x30 which is not plumb and grooves do not go together properly in a few places Western Silo Co. agree to have a man to put up same in condition if purchaser W. C. Mulkey can not remedy matter himself which he agrees to do if possible") "made on the back of such note"; (f) Schopmeyer, who accepted said note with said indorsement thereon was not authorized by these plaintiffs to thus vary the terms of the original contract" (i. e., said "written contract" or "order" of September 12, 1913) and "said endorsement was and is as to these plaintiffs of no force and effect and same is not and never properly became a part of the contract under which the silos in question were purchased by defendant"; (g) if it be true that "Schopmeyer or anyone else assumed to agree with defendant to erect said silos such agreement was * * * the individual contract of the parties and was not and never became any part of the contract of these plaintiffs and they never became bound thereby"; (h) if the silos were improperly erected or fell down and were destroyed because of such improper erection," same was due to the fault and negligence of the defendant, but, as a matter of fact, the silos "after being erected by defendant" were destroyed by God with the element of "a very violent and an unprecedented windstorm" and for that plaintiffs are not responsible; (i) warranty was not made, "on the contrary * * * defendant saw and inspected said silos in their knocked-down condition and knew just what their condition was" and, so, purchased and erected them.

By supplemental answer Mulkey charged that the written "order" of September 12, 1913, "was given after he had bought the silos * * * and in said purchase there was no understanding that defendant would sign any order," that "the salesman simply asked defendant to sign it as a matter of form and he did so without reading it and

without consideration of any kind for its support," that "if plaintiffs' agent Schopmeyer had no authority this fact was not known to him (Mulkey) and said agent acted within the apparent scope of his authority," and that (generally) the averments of the supplemental petition are untrue.

The verdict (on special issues) sustained Mulkey's averments generally and includes a specific finding that the true contract was that alleged by him. The resulting judgment in his favor was affirmed by the Court of Civil Appeals. 7 S.W.(2d) 115. Writ of error was allowed upon assignments presenting questions of law to be particularly noticed.

### Opinion.

■ 1. The "written contract" of September 12, 1913, does not include stipulation for execution of a note.

That the person who procured the note from Mulkey was in charge of that particular matter cannot be doubted; nor can it be doubted that the "endorsement" (within the mutual intent of Mulkey and that person) became a part of the "note." Bell and Clift later took the "note" (with the "endorsement" on it), kept it and sued upon a part of it; and, in our opinion, they had to take the bad with the good.

In so far, therefore, as the claims of Bell and Clift are predicated on the note itself, questions of variance of terms of the "written contract" and of the agents' authority cannot arise.

2. That the "silos," or silo materials, which were actually dealt with, were in Chillicothe on or before September 12, 1913, was averred by all parties, and such is the undisputed fact.

The "written contract" (or "order") of that date, in form had relation to different "silos" or materials, for its request is "please ship to me" the "goods" therein named, and it includes other references not susceptible of literal application to "goods" already at Chillicothe and actually handled at that place on September 12, 1913.

The "order's" description of "goods" is this: "1 silo: 14x30 Pine silo—$258.00; 1 silo 14x30 Fir silo—$309.60."

"Bill of lading and settlement papers are to be mailed to the First State Bank of Quanah," it is said in the "order," and Mulkey "agrees," it is recited, "to receive the above mentioned articles and make settlement * * * on receipt of the goods."

"This order is not binding on the aforesaid company" (i. e., "Western Silo Company") "until accepted by them in writing at their offices in Des Moines, Iowa," it is therein declared, and they (i. e., the "Company") are to be held "blameless if they are unable to make shipment on account of causes beyond their control."

Another recital is that "it is understood that this order constitutes the entire and only agreement between the parties hereto," etc.

It is obvious that Bell and Clift, in order (in any view of the situation) to apply the "written contract" to the actual transaction, would have to resort to extrinsic evidence: E. g. (a) to identify themselves as being "Western Silo Company"; (b) that the "goods" with which Mulkey was dealing were not as yet to be "shipped" under "bill of lading," etc., as yet to be received but, on the contrary, "goods" long since shipped to Chillicothe and in storage there; and (c) that "silos" mentioned in the "order" were in fact in a "knocked-down condition" and, thus, consisted merely of materials and not of "silos." And because of what is thus manifest, Bell and Clift, in pleading, laid the predicate for extrinsic evidence. That predicate was for evidence in some respects contradictory of the terms of the "order," in other respects supplementary thereof and, possibly, in other respects merely explanatory. And their proof conformed. Hence, they developed the fact that the "order" did not "constitute the entire and only agreement between the parties"—contrary to its recitals—for under its exact terms the "goods" could not have been actually delivered to Mulkey at Chillicothe and hauled away by him on or before September 12, 1913, as was done in fact.

■ If (contrary to Mulkey's contentions) the "order" became, in any sense, obligatory, then a situation is presented wherein parts of the arrangement were given evidence in writing and parts were left unwritten—a situation in respect to which the "parol evidence rule" does not so operate as to exclude extrinsic proof of the "unwritten" parts. Thomas v. Hammond, 47 Tex. 42, 52; G. C. & S. F. R. Co. v. Jones, 82 Tex. 156, 161, 162, 17 S. W. 534.

■■ According to the pleading (and evidence) of both parties, the "goods" were at Chillicothe (say, on September 12, 1913), and were then and there delivered to and accepted by Mulkey, and Mulkey immediately thereafter began (and continued) to exercise dominion over them. According to Mulkey's pleading (and proof), all that was done under a verbal agreement, complete in all its terms, and thereafter (upon representation that a "written order" was desired as a mere matter of form, and without anybody's intent of acting on it and without any new consideration) he signed the "written contract." But according to the pleading of Bell and Clift, the "written contract" was signed by Mulkey as complete evidence of the purchase and terms thereof. In pleading, then, there was tendered an issue of fact as to whether Mulkey made and acted upon a "verbal" agreement or one evidenced in writing and about the terms of the "verbal" contract if such was the kind he made. **In**

our opinion (assuming for the instant that Schopmeyer then had real or apparent authority to represent Bell and Clift), Mulkey had a right to prove, if he could, that the so-called "written contract" was not intended to become (and therefore did not become) effective, but that the transactions were intended to be and were governable by terms of the "verbal" contract. The "parol evidence rule" (at least when innocent purchasers are not involved) does not preclude evidence showing that a writing was not delivered "as a present contract" or that there was never any "concluded, binding contract" (in writing) "entitling the party who claimed the benefit of it to enforce its terms." Burke v. Dulaney, 153 U. S. 228, 14 S. Ct. 816, 38 L. Ed. 698.

There are at least two elements present in Lanius v. Shuber, 77 Tex. 24, 27, 13 S. W. 614, and in Jones & Carey v. Risley, 91 Tex. 1, 32 S. W. 1027 (cited by Bell and Clift), not present here: (a) Unquestioned effectiveness (in some degree) of the "written contract"; (b) instrument complete in and of itself and having indicia that its terms were intended to cover the entire field of agreement.

3. By "written contract" of date March 20, 1912, Grady was by Bell and Clift (doing business as "Western Silo Company") "granted the exclusive sale of their silos for the State of Texas and a part of Oklahoma," and Grady was obligated to "promote the sale * * * and in every way possible to advance and promote the reputation of their goods." It was provided that "all orders" would be "taken" and "settlements" would be "made" on forms furnished by Bell and Clift, that "goods" shipped (whether in transit or storage, etc.) would the "property" of Bell and Clift, that "settlements" (whether in the form "of cash or notes") would be forwarded to Bell and Clift, and that of the "settlements" Bell and Clift would "receive 80% of the * * * selling price" if "in the form of notes" and "76% of the * * * selling price" if in "cash."

Grady, in "promoting sales," employed "salesmen," amongst whom was Schopmeyer.

February 20, 1913, Grady procured an "order" from Mulkey for a "silo," and in negotiating the sale agreed to furnish "a man to supervise its erection." The "goods" ordered were furnished and were erected under supervision of the "man" promised by Grady. This was not an "exception" to Grady's "rule" or usual course of business. The "silo" thus purchased and erected was satisfactory to Mulkey.

Some time prior to September 12, 1913, Grady had procured an "order" or "orders" for two "silos" to be shipped to Chillicothe, Tex., the "goods" had been shipped there and (upon refusal of the "purchaser" or "purchasers" to receive them) had been stored, the "goods" (i. e., the "price") having been "charged" to Grady on the books of Bell and Clift. Grady instructed Schopmeyer to "go to Quanah (or Chillicothe) and sell the silos to Mulkey if he could do so and to promise Mulkey that a man would be furnished to supervise their erection." Schopmeyer thereupon went to Mulkey at Quanah and told him what Grady had said and began negotiations which resulted in a "sale" (as early, may be, as "in July," 1913).

According to the testimony of Mulkey (as interpreted and applied by the jury), the agreement of sale and purchase was "verbally" (and completely) made before Schopmeyer requested Mulkey to sign a "written order" as a mere "matter of form"; according to Schopmeyer's testimony, his request for signature and making of signature happened just as the negotiations were being completed. Subsequently, and under Grady's instructions, Schopmeyer went to Mulkey and got the "note" sued on, with the "endorsement" (mentioned) on it and as a part of it; this "note" (with the "endorsement") was turned over to Grady and he accepted it (apparently, without dissent) and forwarded it to Bell and Clift; Bell and Clift "protested" to Grady (but not to Mulkey) about the "endorsement," but kept the note.

■ That the agreements which Schopmeyer made with Mulkey were within the authority given him by Grady there can be no doubt. And that Schopmeyer (at least in part) acted for Bell and Clift is the import of their allegations, for their claims presuppose that he made the "sale" and took the "note" for them.

That Schopmeyer acted (at least in part) for Bell and Clift is the presupposition of their claims. They aver that their agent sold and delivered to Mulkey the "goods" and took the "written order" and Mulkey's note. Thus, there is affirmation of Grady's authority to delegate his authority to promote and make sales of their "goods," and the matter must be judged as if Grady (instead of Schopmeyer) had negotiated with Mulkey.

■ The "written order" which Mulkey had signed in February, 1913, did not include any declaration (or ground of implication) that Grady or other "salesman" lacked authority to make a sale except upon a "written order" or upon the terms different from those named therein. True, that "order" recited that "it is understood that" it "constitutes the entire and only agreement" and that "Western Silo Company will not * * * allow any deductions * * * not specified." But, as is manifest, those recitals had relation to the particular "sale" then being made (of property not then in possession of the "salesman"), and hence did not charge Mulkey (as a matter of law) with notice of lack of authority to make a different kind of sale of other property at another time.

For aught shown, Mulkey knew nothing of the restrictions put on Grady's authority by

terms of the "contract" of March 20, 1912, or otherwise, and the fact of the previous "order" (i. e., the "order" of February 20, 1913) is all that is shown in the effort to charge him with notice prior to (or at) the time when he made (according to his version) the verbal contract. In view of the hypothesis of "verbal contract" made (in any event before, and according to some testimony, weeks before) the "written order" of date September 12, 1913, was signed (as a mere "matter of form," according to his contentions), the knowledge gained (or imputed) in making that signature is not conclusive against him, if, indeed, it has any relevancy on the question now being considered.

█ Schopmeyer had possession of the "goods" with authority to sell and deliver them in any event. His authority to make terms was implied and apparent (since, as we have held, Mulkey is not shown to have had knowledge or to be chargeable with notice of existent restrictions).

4. All of the matters presented in the petition in error are governed by the fact of admissibility of testimony introduced in support of Mulkey's averments of "verbal" contracts (discussed in 2 above) and by the conclusion expressed (in 3 above) in respect to the implied or apparent authority of Schopmeyer.

Accordingly, we recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.