## STANDARD MOTOR CO. v. MILLER.
### No. 2173.

Court of Civil Appeals of Texas. Beaumont.
Jan. 13, 1932.

C. E. Pool and Crook, Lefler, Cunningham & Murphy, all of Beaumont, for appellant.

Howth, Adams & Hart, of Beaumont, for appellee.

### O'QUINN, J.

The Standard Motor Company sued Jack Miller, doing business under the trade-name of Jack Miller Tire Company, to recover on a promissory installment note in the sum of $2,122.25, and for foreclosure of a chattel mortgage lien on three automobiles given to secure the payment of the note.

The defendant answered by general demurrer, general denial, and specially as follows:

"For further answer still if same be necessary this defendant alleges that on or about and before June 12, 1928, the defendant was really not interested in purchasing the three Pontiac cars or automobiles alleged in plaintiff's petition, but plaintiff and its duly authorized agents and representatives were trying to persuade defendant to take three said cars and represented to defendant that if he would take said three cars that defendant would not have to pay all cash for same, but that plaintiff would make an arrangement whereby defendant was to turn in one second hand or used automobile, to-wit: a Pontiac Landau Sedan, for an agreed price of $600.00, and plaintiff further represented to defendant that as further part of the consideration for said three cars plaintiff would take twenty Dixie Auto Club memberships at the rate of $12.00 per membership, making $240.00, and plaintiff further represented that the said second hand automobile above described and the said twenty Dixie Auto Club memberships, together with a check for $215.00 (which was given defendant by plaintiff as a refund on tires, and which was endorsed back to plaintiff, to satisfy plaintiff's bookkeeping and accounting system) would constitute the down payment on said three automobiles; that plaintiff further represented to defendant that if he would take the said three automobiles above named that the balance on said three automobiles could be paid in an agreed number of Dixie Auto Club Memberships, to be delivered in the future at such times that the plaintiff would desire same, the plaintiff or its duly authorized agents or representatives well knowing that defendant was connected with Dixie Auto Club, and had an arrangement whereby he could furnish to plaintiff the number of memberships contemplated by the parties; plaintiff or its duly authorized agents or representatives further represented to the defendant that defendant would not have to make any outlay of money for the agreed balance due, as above alleged, but that same would be taken out in Dixie Auto Club memberships, as above set forth, as plaintiff desired them; relying upon these representations defendant agreed to take the three said automobiles and did so; plaintiff, through its duly authorized representatives or agents, explained to the defendant that plaintiff's books had to be kept in a certain way and that certain entries would have to be made and certain papers signed, but that the above arrangement would be the thing which would govern; defendant has been at all times ready to carry out his part of the bargain, but the plaintiff, after ordering other memberships than the first twenty above named, and at a date later than the time the first twenty were delivered, conceived the idea that the plaintiff was paying a little more money for said memberships than were other people, and plaintiff or its duly authorized agent or representatives set about to get out of the deal, which had already been consummated, as hereinbefore set forth; that any written instrument or instruments which may have been signed by the defendant, if same were executed, were induced to be executed by the misrepresentations or fraudulent representations of the plaintiff or its duly authorized representative or agent, and this constitutes an exception to the general rule about varying a written instrument with parol testimony; defendant further sets forth that he is now and has been at all times ready to carry out the real agreement that was actually made between the parties with reference to him taking the said three cars, and if it was to be regarded as a money transaction, as plaintiff attempts to allege, defend-

ant would not and could not have made same, as plaintiff and its duly authorized agent or representatives well knew."

Defendant prayed that plaintiff take nothing by its suit.

Plaintiff, by supplemental petition, generally excepted to defendant's answer, and specially excepted to same because the allegations therein attempted to vary the express terms of a written contract by an alleged parol agreement, that same were insufficient to plead fraud, and denied all matters alleged therein.

Plaintiff's general demurrer and special exceptions to defendant's answer were overruled. The case was then tried to a jury upon special issues, as follows:

"Special Issue No. 1. Do you believe, from a preponderance of the evidence, that the real agreement between the plaintiff, Standard Motor Company, and the defendant, Jack Miller, was that the balance of the amount due on the transaction in question was to be paid in Dixie Auto Club membership certificates?" The jury answered "yes."

"Special Issue No. 2. Do you find, from a preponderance of the evidence, that Bertram, as the authorized agent of the plaintiff, Standard Motor Company, before or at the time the defendant, Miller, signed and delivered the note and mortgage in question, represented to the defendant, Miller, that said note and mortgage were only for form's sake and bookkeeping purposes for plaintiff's benefit and that the defendant would not be compelled to pay said note in cash or money"? The jury answered "yes."

"Special Issue No. 3. If you have answered the foregoing issue No. 2 'no,' you need not answer the following, but if you have answered it 'yes,' then answer the following: Special Issue No. 3. Do you believe, from the preponderance of the evidence, that the defendant, Miller, believed said representations (if you have found that same were made) and relied thereon and was thereby induced to sign said installment note and mortgage?" The jury answered "yes."

"Special Issue No. 4. Do you find from the preponderance of the evidence that said representations (if any) by the said Bertram were fraudulently made to induce the defendant to sign the installment note and the mortgage in question?" The jury answered "yes."

On the findings of the jury, the court entered judgment that plaintiff take nothing by its suit. Motion for a new trial was overruled, and plaintiff has appealed.

The record discloses that on June 12, 1928, the plaintiff, Standard Motor Company, was engaged in the sale of Pontiac automobiles in the city of Beaumont, with H. E. Bertram its vice president and general manager, and I. J. Miller, known as Jack Miller, was doing business under the trade-name of Jack Miller Tire Company in Beaumont. On said date plaintiff sold and delivered to the defendant three Pontiac automobiles, the total consideration for which was $2,925 for the cars and $253.10 carrying charges, making $3,178.10. As down payment $600 was allowed the defendant for a used car, $215.85 for the tires plaintiff removed from the three cars, and $240 for twenty subscriptions to membership in the Dixie Auto Club valued at $12 each, making the sum of $1,055.85. This left the sum of $2,122.25 balance to be paid on the cars for which the purported note sued on was executed by defendant. He also executed a chattel mortgage on the cars to secure the payment of said purported note—the one sought to be foreclosed by plaintiff.

The note in question reads:

County Jefferson $2122.25
State Texas

"Schedule of Payments   City Beaumont

| No. | Due | Amount | Date June 12, 1928. |
|---|---|---|---|
| 1 | July 12/28 | 197.25 | At the time or times |
| 2 | Aug 12/28 | 175.00 | as stated in The |
| 3 | Sep 12/28 | 175.00 | schedule of payments |
| 4 | Oct 12/28 | 175.00 | hereon after date, for |
| 5 | Nov 12/28 | 175.00 | value received, I, we |
| 6 | Dec 12/28 | 175.00 | or either of us prom- |
| 7 | Jan 12/29 | 175.00 | ise to pay to Stand- |
| 8 | Feb 12/29 | 175.00 | ard Motor Company, |
| 9 | Mar 12/29 | 175.00 | or order, the sum of |
| 10 | Apr 12/29 | 175.00 | two thousand one |
| 11 | May 12/29 | 175.00 | hundred twenty two |
| 12 | June 12/29 | 175.00 | and 25/100 dollars at |

the office of Standard Motor Company, with interest from $\{^{\text{date}}_{\text{maturity}}$ until paid at the rate of ten per centum per annum, payable at maturity; and if interest be not paid when due at option of holder, to become as principal and bear same rate of interest until paid, and in case an attorney or special collector is employed to collect this note or if it should be collected by suit or through a bankrupt, a probate, or any other court we agree and promise to pay an additional amount of ten per cent of principal and interest then owing thereon, as attorney's and collector's fees provided, however, that in case such ten per cent of principal and interest should be less than fifteen dollars, then I or we agree and promise to pay a minimum sum of Twenty-five dollars as attorneys and collectors fees.

"This note is given as part of the purchase money for and is secured by the Chattel Mortgage Lien upon 3 Pontiac Automobiles: 1 Pontiac Coupe, 1 Pon. 2-door, 1 Pon. Lan. Sed. automobile and all equipment said automobile having factory serial number —— this day sold to Jack Miller Tire Company by —— Standard Motor Company.

"This is an Installment note and failure to pay any of the installments or the interest thereon when due, at the option of the holder matures all of said installments not then due, and the holder is hereby authorized to immediately institute proceedings for collection

and the foreclosure of the Chattel Mortgage Lien retained in Bill of Sale and Chattel Mortgage of even date.

"Jack Miller Tire Company,
"By I. J. Miller."

The mortgage pleaded by plaintiff was on the usual printed blank form used in selling automobiles, and contained the usual stipulations in such mortgages. It was in evidence, as was also a signed customer's order for the cars on one of the usual printed blank forms for such order.

Among other things, the defendant Miller testified:

"On or about June 12th of 1928 I had some dealings with Mr. Bertram of the Standard Motor Company at Beaumont, Texas. I am not sure what connection Mr. Bertram at that time had with Standard Motor Company but I think he was Manager. At a date earlier than this deal of the agreed purchase of automobiles I was approached by a salesman, Mr. Clifton of the Standard Motor Company with regards to buying one automobile. I needed it badly in my business but I was questioning my ability to pay for the one car after I bought it and was holding off. This rocked along a while and I was down in the Standard Motor Company office one day and Mr. Bertram asked me about the automobile club. That was the Dixie Automobile Club. It was highly advertised at that time and there were quite a bit of memberships sold and Mr. Bertram was quite interested and so he told me he had a way for me to buy an automobile without a cash outlay. I took it under consideration at my business a while and another contact came about to consider another automobile on the same basis and I think we had three contacts and finally it was agreed that I could trade in the old car that I had, take all the tires off the new cars and put the tires that I was selling on them; they would accept memberships in the Automobile Club enough to make $1055.00 or the amount of down payment on three cars and the used car was traded in for $600.00. The Standard Motor Company got that car and the Standard Motor Company then took the tires off these new cars with which they had come equipped, and I put my tires on. Mr. Bertram wrote a check for $215.00 payable to me for the tires and I endorsed it and turned it back to him. This was done to satisfy his bookkeeper, instead of issuing just a credit memorandum on the tires that were taken off, it was handled that way, and then the Automobile Club memberships amounted to $240.00. That amounted to the down payment. At the time I was taking possession of the cars Mr. Bertram said that this bunch of memberships that he was going to take in the amount of twenty one hundred and some odd dollars would be divided over a period of twelve months, this balance due. He said he would take memberships in the Automobile Club each month, to satisfy that amount and that he might take them up in three or four months time or less, or he might take them up over a longer period of time. His plan was to give each one of these memberships away with every used automobile sold as an added inducement to sell the automobile and it depended entirely on his used car stock. He took steps to do that and advertised it in the newspapers, the Beaumont Enterprise and Journal, that he was giving away a membership in the Dixie Automobile Club with each used car. He instructed his salesmen that the amount involved in the price of Dixie Automobile Club membership which was twelve dollars would be deducted from the price of the used car and that they were urged to push these used cars on the basis of this additional value that they could get by carrying the membership in the automobile club. At the time that I started to take delivery of the automobiles he said that he would be unable to satisfy his stockholders and charge off this much money in one month as advertising and if he had the cars out they would be deducted from his stock and there would be a variation there around two thousand dollars and nothing to account for it until all of the memberships were accepted and charged as advertising. Therefore to keep his books straight he wanted me to execute such papers that you have before you but this didn't have anything to do with the deal other than to keep his books straight and keep his stockholders satisfied, or auditors or whoever might inspect his books with regard to the amount of advertising that would be turned loose. In that way it could be charged off as advertising each time a twelfth of the amount. All of the notes were set up, $197.00 and something for the first one and $175.00 a month after that. The automobile club memberships were to act in the place of money on these notes and at that time I could have bought on a cash basis or on the terms three automobiles without any view to paying for them, but under this inducement of getting the automobiles and incidentally promoting my business by moving some of my merchandise for these automobile club memberships sent customers to me, I thought that it would be good business for me to go ahead and accept the three automobiles and let him have the memberships each month or as he saw fit to take them. Then at a later date he accepted more memberships to apply on the notes but he had found out that we were giving a commission to salesmen for selling the memberships and he wanted to deduct the salesmen's commission off and so we agreed, instead of charging him twelve dollars per membership, to let him have the twelve dollar membership for eight dollars and that he could take as many more memberships to get the same amount of money. It started out with an arrangement to take 175

memberships and wound up with an agreement to take 265; with the possible exception that the figures will vary some in the amount of eight dollars each to satisfy the unpaid balance of $2100.00. The next thing I knew he was trying to collect cash on the papers that I had signed, claiming that there wasn't any such agreement and so forth and so on, and all the trouble that I have had, and at the end of about three months—things went along nicely for three months. Before and at the time this arrangement and negotiation and deal with Mr. Bertram acting for the Standard Motor Company, I had an arrangement whereby I could get the memberships in the Dixie Automobile Club. I wasn't interested in the Automobile Club other than that I on a service contract to give service to the members of the Automobile Club. I gave him the first twenty memberships all right; that amounted to two hundred forty dollars. The automobile that was turned in for six hundred dollars belonged to Mr. Davant, my father-in-law. At the time Mr. Bertram asked me to sign the papers, figuring it was quite aside from the deal, I considered I had better seek counsel and so I called Mr. Davant on the telephone and asked him. Mr. Bertram was present in his office at that time. Mr. Davant and I talked about that a little bit; I told Mr. Davant that we had made the deal as we had arranged on automobile club memberships and that Mr. Bertram wanted me to sign papers as though it was an ordinary deal, to satisfy his bookkeeping department, and anybody who might be looking over the books, to see that he had spent two thousand dollars at one time for advertising; and that I thought it was a little bit out of line. After Mr. Davant's conversation I decided that Mr. Bertram being a business man and a square shooter, that he would live up to the agreement as we had it at the time, and so I signed the papers.

"I have been ready and willing and able at all times to carry out my part of the real agreement. Mr Bertram has not carried his part of the real agreement. I sent him the memberships all at one time and they were returned to me. He actually accepted more than the first twenty memberships; he accepted ten memberships at eight dollars after the original deal to apply on the amount that was due on the cars. I tendered him the memberships for the amount due. It is a fact that these three new Pontiac cars that were delivered to me were delivered without the payment of a nickel in cash from me to them. I sold tires in my business and they took the tires off of these three cars they let me have and in place of them they gave me a check for $215.00 that I endorsed back to them and then I put my tires on, the tires from my stock. The Standard Motor Company got the use and benefit of that $215.00. It was applied on the

amount of the cars. It was no cash consideration.

"If I had known that Mr. Bertram would later insist on payment of these instruments that he wanted me to execute I would never have gone through with the deal; I would never have approached him on an automobile at all. The arrangement which I say that Mr. Bertram represented to me as the true arrangement and the one that was given between us, I relied upon that representation; that was what caused me to take the three automobiles. I relied on those representations."

On cross-examination he testified: "The check for $215.85 payable to Jack Miller Tire Company and signed by H. E. Bertram and S. S. Parker, was for the tires. That was for the tires that were on the automobiles at the time I purchased them. Those were tires that he requested be taken off and I buy the automobiles free of tires and put my tires on. The tires on an automobile have some value. The tires on these automobiles represented a certain price; take the tires off and it will be $215.00 left (less). They gave me a check for $215.00 which was to apply on the down payment."

He further testified: "The check for $240.-00, which you show me, payable to Jack Miller Tire Company, signed by H. E. Bertram and S. S. Parker is for the sixty (20) automobile club memberships on the down payment, the payment on the tires. It was for twenty memberships at $12.00 apiece. Mr. Bertram gave me a check for the twenty memberships and it was endorsed back and applied on the down payment. As to whether I endorsed it back and turned it in as cash, I will say it was not explained to me as a cash payment. It was to satisfy his bookkeepers."

He further testified: "I did tender to the Standard Motor Company, the plaintiff in this case, those memberships in full payment of these notes. I can't remember the date but think it was after they had tried—it must have been around three months after the original deal. At that time I tendered them the memberships for the balance due, including the whole $2100.00, for the entire amount; with a possible variation for making errors in mathematics, or something of that kind. What I mean by making errors in mathematics is that you might take $2100.00 and divide it by twelve and you might put down the wrong figure or something, but I did tender within about three months of the transaction all of the certificates in full payment of all the notes. * * *"

He further testified: "The mortgage which I signed in this instance, the notes and the purchaser's statement, or the purchaser's order etc., and so on, go to consummate or complete an automobile deal, and that was the papers that I was asked to sign after the

consummation of the deal. It may be that Mr. Bertram wrote me a letter and asked me to pay the installments on the notes that were past due. I know that he sent a collector. I suppose it is a fact that after he sent the collector to me that I then wrote him this letter bearing date August 28, 1928."

On redirect examination he further testified:

"In the customer's order, which has been introduced here, there is no mention of $240.-00 nor of $215.85 either.

"When I delivered the tire back to them that came on those three new cars that would amount to $215.85. Mr. Bertram gave as his reason for giving me a check and then letting me endorse it back to him that it was to satisfy his bookkeeping system. The check for the $240.00 is for the first twenty Dixie automobile club memberships that I delivered him. The reason of his giving me the check for $240.00 for those memberships and my endorsing it back to him was the same as I have already stated. It was a matter of satisfying his accounting system. I don't know any explanation why Mr. Bertram was so strong for the Dixie Auto Club memberships at first and then went back on his deal. I don't know any reason why he should. I know that he had actually, in compliance with his newspaper advertising, sold some used cars and given these Dixie Automobile Club memberships with the sale of the used cars. I can't give you the name of our customers without going and looking up the records. but we serviced at my place of business a number of automobiles that were sold by Standard Motor Co., carrying Dixie Automobile Club memberships. There was more than one. During this advertising campaign Mr. Bertram secured ten additional memberships other than the $240.00 worth originally."

On recross-examination he further testified:

"I signed the customer's order which has been introduced in evidence here by plaintiff. I knew what was in it when I signed it. I understood the terms of that customer's order; I am more or less familiar with the terms of a customer's order, but this was aside from the regular agreement. I didn't read it over but I know what the usual terms of a customer's order are. It is a customer's order agreeing to take certain automobiles and merchandise. I understood what the terms of that were when I signed it. I signed the note which has been introduced in evidence as plaintiff's exhibit No. 1. I understood the terms and condition of that note when I signed it. It provided for the payment of so many dollars as agreed. That agreement was not in the note, but that was to satisfy his bookkeeping system. I understood the terms of the note as per our agreement; that is the reason I signed it. I did not read the note. I used to work for Standard Motor Co. I presume that is the type of note they use in getting people to sign them for automobiles. I am not very familiar with the terms of it. I now say that I didn't particularly understand the terms of that note when I signed it, because there are a lot of terms in a note that never come up.

"I signed this Chattel Mortgage and I understood what that was when I signed it; I understood that was a certain paper to be kept in the file. I understood it was a lien against the automobiles. Mr. Bertram did misrepresent to me the terms of that note that was in writing there. He represented to me that that didn't involve dollars; that it was just a matter to keep his books straight. Mr. Bertram did not lead me to believe that what I say was verbally agreed to was incorporated in that note. He didn't lead me to believe that the terms of that mortgage were different from what it is, in fact, he did lead me to believe that the terms of that mortgage were different from what it is. He did lead me to believe that that mortgage was something else other than a lien against the automobiles, and that that mortgage was something else except a chattel mortgage to secure the payment of those notes. He told me that was just a matter of form; that it would be in his file to keep the records straight.

" * * * It is true as I told the jury that Mr. Bertram told me certain ways that this was to be paid that is not incorporated in these papers. I have told the jury that he made certain representations that are not in these papers. Neither Mr. Bertram nor any one else for Mr. Bertram or the Standard Motor Company told me that this note here which is Plaintiff's Exhibit No. 1 had anything in it about paying this by these automobile certificates; that would have defeated his purpose in making the paper. It does not appear on the face of the note that I was to pay these monthly payments by these automobile certificates. As far as the note as it is written is concerned there is nothing that he told me was in it that is not written in there. As far as this note is concerned I am not attempting to tell this jury that there is anything in that note that was misrepresented to me as not being in the note. It is just as it was and just as I understood it, as far as the paper is concerned, to serve the purpose for which it was made. I claim it was merely a ruse and device. I am not trying to lead the jury to believe that I didn't know the writing in this customer's order, practically what it was; I knew generally what is in it. I used to be a salesman for them. The matter of getting these customer's orders signed up was usually done in the office. The salesman seldom ever closed a deal; in fact, I don't believe I ever did. I knew a customer's order wasn't binding be-

cause I took a number of them that did not bind. I am not trying to tell the jury that Mr. Bertram told me there was something in that customer's order that is not there. As I signed it there, that is just about the regular customer's order. As to the chattel mortgage I am not trying to tell this jury that there was something in that piece of paper that I was misled about as being in the paper. In other words, as far as these three pieces of paper are concerned, the customer's order, the note, and the chattel mortgage, there is nothing in there that Mr. Bertram misrepresented to me as not being in there. The thing that I am trying to say is that outside of those things there was a misrepresentation that he made, and the misrepresentation is not as to what is in the things that I was signing.

" * * * Mr. Bertram represented to me that those were just to satisfy a purpose in the office."

R. C. Davant testified:

"I know Mr. H. E. Bertram who in July of 1928 and before was connected with the Standard Motor Co. I have known him for years. I don't know that I had ever met him and talked to him personally. I know Jack Miller. He is my son-in-law. I have just heard detailed here a transaction about three cars, three Pontiac cars that were delivered to Jack Miller by Standard Motor Co. and about Jack Miller giving as part of the payment to them a used Pontiac car.

" * * * The used automobile which was traded in to the Standard Motor Co. on this deal was my car. I did not get any of these three new cars that the Standard Motor Co. furnished. I was at one time connected with the Dixie Automobile Club. I had a conversation with Mr. Miller with reference to signing this note. Mr. Miller called me over the phone and said he was in Mr. Bertram's office and Mr. Bertram desired to sign this note for the purposes of keeping his books straight and not showing up all this advertising in one month and he asked me if he should sign it. That was practically all he said in regard to it, asked me about signing the note."

J. A. Stephens testified that he was connected with the Standard Motor Company as a salesman, about the time the matters in question transpired, and that Bertram was manager; that the sales force of plaintiff were told in a sales meeting that Dixie Auto Club memberships would be given with every used car sold for $150—that is, that the Standard Motor Company would give a Dixie Auto Club membership certificate with every used car sold for $150 or more; that plaintiff had on hand a supply of used cars; and that there was no limit to the number of the Dixie Auto Club memberships. He said: "We were told that there were the cars and to get out and sell them and no time was fixed. We had cars and were anxious to sell them and they (Dixie Auto Club memberships) was added as an inducement to sell the cars. It was put in the papers."

W. L. Clifton testified that he was employed as a salesman by plaintiff. He said: "During the sales meeting, all the salesmen were told that Standard Motor Company had Dixie Auto Club memberships to give away with used cars above $150.00. We were told to push the sales and stress Dixie Automobile Club memberships free with each sale. That was used as a means of selling cars. They advertised it in the paper and all the salesmen used that as selling talk. There was no amount of memberships mentioned, as to the number of these Dixie Auto Club memberships that they had in their possession or that they could get."

Mr. Bertram, manager of plaintiff, testified:

"My name is H. E. Bertram. On or about June the 12th, 1928, I was engaged in the automobile business with the Standard Motor Co. of which company I was Vice-President and General Manager. I heard the testimony of Mr. Miller here about my having agreed to take Dixie Automobile Club memberships for the full payment of the note introduced in evidence. That is not the agreement that was made between me and Mr. Miller. The contract entered into between Standard Motor Co. and Mr. Miller was not any different from that that is expressed in the written note and mortgage and customer's order here introduced.

" * * * I saw that check for $240.00 there. That was given in payment of a purchase. It was given in payment of the purchase of twenty automobile certificates, Dixie Automobile Club certificates. That happened at the very time that the deal was made for the three cars. And it was immediately then and there endorsed back to Standard Motor Co. and was deposited by Standard Motor Co. As to my explaining to the jury the necessity for issuing a check, I will say it was in payment of a debt; in payment of a contract. As to why that could not have been handled by allowing the twenty automobile club certificates to go in as themselves at that time for part payment on these three automobiles, I will say that a cancelled check, especially after it has been run through the bank, serves as a receipt in payment of a purchase order, which was issued on this particular purchase. It is not necessarily true that it amounted to the same thing as our that day getting twenty Dixie Automobile Club certificates as part payment on the three cars. The practical effect of it was not the same thing, because we bought and paid for the certificates. It did not strike me as strange that it would happen right there at

the same time that the transaction was being made for the three cars. The three Pontiac cars that were included, to be delivered there, had tires on them. We took those tires off. Jack Miller was handling tires himself. As to whether it is true that Jack Miller was to get credit for the tires that were on those three cars, I will say he sold us the tires on those three cars, as shown by our purchase order. All that happened right at the same time that the deal was being made for these three cars, right on the same day that it was completed. The very moment that we gave him the check for $215.85, he at once transferred it back to us. It is not necessarily true that for all practical purposes the tires that we took off of these three cars really went into the purchase price of the three cars. As to the necessity of any check issuing at all, I will say when a man buys something and contracts to pay for it he usually pays for it. About the best way to pay a bill is to pay it by check or cash. Mr. Miller didn't give me those tires; he sold them to me. That is my explanation of that transaction. I heard the testimony of these former employees of the Standard Motor Co. to the effect that we were giving away a Dixie Automobile Club membership or certificate with the purchase of every used car sold by Standard Motor Co. after a certain date provided the car was sold for over a hundred and fifty dollars. That was done. We advertised that in the papers, too. I should say that was advertised in the papers for approximately three weeks or possibly four. The ad was not a very large ad; it was an ad of about one by six. It is not true that during the month of July, right after we got these Dixie Automobile Club memberships and right after we did all this advertising we had a good used car sale at that time. I am positive of that. I would not say that we had a less sale than usual. July is a better month than June; we sell more used cars in July than we do in June. The increase in used cars sales for July over the sales in June was not a substantial increase; the increase was not abnormal. I was all pepped there for a while about these Dixie Automobile Club memberships. I couldn't tell you how much I spent in advertising them, but possibly two or three hundred dollars. $240.00 is what we paid for the first twenty memberships. Our advertising to the public generally costs about as much as the original cost of the first twenty certificates. The certificates that we gave to purchasers of second hand cars amounted to about fifty per cent of what we had; possibly a few more. There are no figures in the sum of $215.85 in the customer's order given by Mr. Miller in this transaction and there are no figures in the sum of $240.00 for the memberships in that customer's order. It is not true that the deal in so far as it went was

carried on exactly like Jack Miller said this morning. The deal was not carried out in accordance with the customer's order. The customer's order certainly has meant something. The $240.00 plus $215.85 represents the cash deposit on which a receipt was issued bearing our number 5795. The purpose in issuing two checks there when we put on the customer's order just one item was because there were two separate transactions and they were handled and charged in two different departments. The reason we don't put them on the customer's order there is two different transactions is because they were received as cash. There is a reference there in that order to the second hand car that we took in. It is in that item of $600.00. We have that down as a cash allowance. I don't consider anything cash unless you go to the bank and get the money on it. The reason that we did not issue him a check for $600.00 for this car when it was turned in and let him endorse that back to us is because it is the policy of our company not to buy and pay cash for used cars. That is not shown on the customer's order as a cash item but as a cash deduction, or as a deduction.

"When this deal was being negotiated I did not know that Jack Miller wasn't able to pay for three cars. I heard my salesman's testimony, Mr. Clifton. I heard him testify to the effect that he was trying to sell Mr. Miller one car because he thought that was all that he wanted but after he found out that he could possibly sell him a few more he registered him for more cars. He did not sell Mr. Miller that one car until I had talked to Mr. Miller. After I talked to him he took three cars. At the time this negotiation was taking place, there was a Dixie Automobile Club representative there in conference with Jack Miller and me on the negotiation. I don't know what he was doing there. He was with Mr. Miller. He did not sign any of the papers. He did not take any part in the negotiation that I know about. I don't remember whether he said anything or not. I expect he did say something but he had nothing to do with the contract. I understood he was introducing the Dixie Automobile Club in the city of Beaumont and I understood at that time that he represented this club and had sold Mr. Miller the franchise or had given him the right to operate in this city. I did not know that Mr. Davant was also about this time connected with the Dixie Automobile Club. After Mr. Miller told me that Mr. Davant was his father-in-law I knew that fact. I do not deny the fact that Jack Miller called Mr. Davant from my place of business down there and I was present. Mr. Miller told me that the car he was trading in belonged to Mr. Davant and that before he made this trade he wanted to call Mr. Davant, his father-in-law, to see whether

or not the allowance and the trade was satisfactory and at that time the note and the payments were mentioned over the telephone. I don't remember the exact wording but I do know that Mr. Miller outlined the transaction as it was signed up. I heard Jack Miller testify here this morning that he told Mr. Davant that I was just insisting that those instruments be executed for bookkeeping purposes, but I did not hear him say that over the telephone. I also heard Mr. R. C. Davant testify on the stand that Jack Miller called him and said over the telephone that I was just wanting these written instrument executed for bookkeeping purposes. As to whether I dispute his statements I will say that I am not responsible for Mr. Davant's hearing but I do know' what I heard. If Mr. Miller at the time of this transaction had told Mr. Davant over the telephone that were to take all of this $2100.00 out in Dixie Automobile Club memberships, I would have corrected him immediately and would not have delivered the cars under any condition. As to how I was figuring an unlimited supply of Dixie Automobile Club memberships, to furnish to my prospective purchasers as advertised in the paper, about the best answer I can give you to that is that if I was giving away a can of beans with every automobile why I expect I could go out and buy them somewhere. Mr. Miller advised me that he had plenty of these memberships and all we had to do was to pay for them. It is true that you can buy a can of beans at almost every grocery store but there was only one Dixie Automobile Club here at that time. The way in which I expected to live up to my advertising in the paper was by buying the memberships and paying for them as I needed them. I recognized then at that time that Dixie Automobile Club memberships were a good thing; I thought they were and so advertised to the public. I intended to buy more of them. We advertised these in the Enterprise and Journal. All of that advertising happened shortly after the time that the transaction for these three automobiles in question was made. It was possibly two or three days after that. I had not thought so much of Dixie Automobile Club Memberships before the time of this transaction and had not seen fit to do all this advertising before that time, but immediately after the transaction for these three cars was when I began that big campaign in the papers, advertising about giving away these memberships. It is not necessarily true that if somebody in Beaumont like Jack Miller would furnish a courtesy car for Dixie Automobile Club members that it would redound to my benefit. Mr. Clifton was a salesman for us at that time and Mr. Stephens was a salesman; I don't know that he was working on the inside, but I believe he was a salesman. I don't think that it is true that Mr. Stephens at that time and both before and after that time worked on the inside and the outside; I don't remember. I wouldn't say it is not a fact; I really don't remember. We had so many salesmen down there. I did not hear Stephens say in his testimony that we represented that we had an unlimited supply of these memberships. I don't believe any of the officers of the company made the statement that we had an unlimited supply. It was I who talked to the salesmen and I did not make that statement. I am the only one who talked to the salesmen about those Dixie Automobile Club memberships. I had charge of the sales work at that time; it was directly under my supervision. I had some assistants. I don't know what they told the salesmen. I don't know whether they might have told the salesmen just what Mr. Stephens said."

The principal contention urged by appellant, in various assignments, is that evidence of the verbal contract should not have been admitted, but that the rights of the parties should have been determined by the terms of the written contract as evidenced by the note, mortgage, and customer's order. Under the pleadings and the facts in evidence, this contention must be refused. Evidence which shows that the writing was never delivered with the intention that it was to become a binding contract is admissible. But, if the writing has been finally delivered as a contract, evidence which contradicts or varies its terms is not admissible. In other words, if parol evidence is offered for the purpose of showing that the writing was not intended to be and was not the actual or real contract, but that the contemporaneous parol agreement pleaded was the real contract, it is admissible. Bell v. Mulkey (Tex. Civ. App.) 248 S. W. 784; Bell v. Mulkey (Tex. Civ. App.) 7 S.W.(2d) 115; Bell v. Mulkey (Tex. Com. App.) 16 S.W.(2d) 287. Judge Boyce, in Bell v. Mulkey (Tex. Civ. App.) 248 S. W. 784, 786, said: "It has been held in a great many cases that the rule against the admission of parol evidence of prior or contemporaneous agreements to vary or contradict the terms of a contract reduced to writing does not apply to evidence offered to show that the writing is in reality no contract at all. Under this rule, evidence has been admitted to show that a contract was executed as a joke; as a mere matter of form or to be exhibited to induce action by some third person with no intention that it should bind the parties; or upon condition precedent to its validity as a contract—" citing Coffman v. Malone, 98 Neb. 819, 154 N. W. 726, L. R. A. 1917B, 258, and notes, 263–267; Grierson v. Mason, 60 N. Y. 394; Bouchet v. Oregon Motor Car Co., 78 Or. 230, 152 P. 888; Humphrey v. Timken Carriage Co., 12 Okl. 413, 75 P. 528; Church v. Case, 110 Mich. 621, 68 N. W. 424;

Deierling v. Wabash Ry. Co., 163 Mo. App. 292, 146 S. W. 814, 816; Olmstead v. Michels (C. C.) 36 F. 455, 1 L. R. A. 840; Southern Street-Railway Adv. Co. v. Metropole Shoe Mfg. Co., 91 Md. 61, 46 A. 513; Page on Contracts (2d Ed.) 2176.

Discussing the rule here in question, in Burke v. Dulaney, 153 U. S. 228, 14 S. Ct. 816, 818, 38 L. Ed. 698, it is said: "The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to show that there is no agreement at all is admissible."

In 22 C. J. 1211, it is said: "The rule which excludes parol evidence to contradict or vary the terms of a written agreement, can be applied only when a written agreement is proved to exist between the parties, and consequently parol evidence is admissible to show that a writing, although purporting on its face to be a contract, was not in fact intended by the parties to be such. Furthermore, where a paper set up as an agreement is not admitted to be such by the party sought to be affected by it, and there is a conflict of evidence on the question whether it is such agreement or not, the court will not exclude testimony adduced to prove a verbal agreement differing in its terms from the written one, but will merely direct the jury to disregard such testimony in case they find the writing to be the agreement of the parties." This is quoted with approval by Judge Hall in Bell v. Mulkey (Tex. Civ. App.) 7 S.W.(2d) 115, 117, citing many authorities.

In Burns & Smith Lumber Co. v. Doyle, 71 Conn. 742, 43 A. 483, 484, 71 Am. St. Rep. 235, it is said: "The rule applied in the latter class of cases is that you may show that a writing purporting to be a contract never came into existence as a contract, or has ceased to be a contract, and may show this, of course, by evidence outside of the writing. This latter rule is not an exception to the former, nor an infringement of it."

In Peugh v. Davis, 96 U. S. 332, 336, 24 L. Ed. 775, it is said: "The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument. Thus, it may be shown that a deed was made to defraud creditors, or to give a preference, or to secure a loan, or for any other object not apparent on its face. The object of parties in such cases will be considered by a court of equity; it constitutes a ground for the exercise of its jurisdiction, which will always be asserted to prevent fraud or op-

pression, and to promote justice." This was followed in Brick v. Brick, 98 U. S. 514, 25 L. Ed. 256.

Numerous decisions from many jurisdictions could be cited to show the rule well established.

 We think the finding that the contract in writing was executed as a matter of form, with no intention that it should be the real expression of the agreement of the parties, and that the parties, as a matter of fact, acted under the parol agreement or contract, rather than the writing, is amply sustained by the evidence.

The assignments urging that the court erred in submitting special issues Nos. 1 and 2 to the jury are overruled. Under the pleading and the evidence, the issues were proper.

Since the answers of the jury to special issues 1 and 2 establish that the instrument sued on was not the actual or real contract made by the parties, but that the parol agreement asserted by appellee was the real contract, these findings are conclusive of the case, and render the other questions presented immaterial; hence they will not be discussed.

The judgment should be affirmed, and it is so ordered.